## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| EDDIE HIGGINS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO.: _____ |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| VOLKSWAGEN GROUP OF | ) | |
| AMERICA, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

_____

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs listed and set forth herein below file this Original Complaint and Jury Trial Demand complaining of Defendants Volkswagen Group of America, Inc., Volkswagen Aktiengesellschaft, Audi Aktiengesellschaft, and Audi of America, LLC and for cause of action would show as follows:

## PARTIES

## PLAINTIFFS

### The Arkansas Plaintiffs

1.      Plaintiff Eddie Higgins is a citizen of the State of Arkansas who acquired a 2013 A7 in the State of Arkansas.

2.      Plaintiffs David Lupo and Susan Lupo are citizens of the State of Arkansas who acquired a 2014 Q5 in the State of Arkansas.

3.      Plaintiff David Mcleod is a citizen of the State of Arkansas who acquired a 2016 A7 in the State of Arkansas.

1

**The Arizona Plaintiffs**

4.      Plaintiff Yotam Benami is a citizen of the State of California who acquired a 2012 A7 in the State of Arizona.

5.      Plaintiffs Michael Castro and Catherine Castro are citizens of the State of New Mexico who acquired a 2012 A7 in the State of Arizona.

6.      Plaintiff Robert Plous is a citizen of the State of Arizona who acquired a 2012 A7 in the State of Arizona.

7.      Plaintiff Emerald Greig is a citizen of the State of Arizona who acquired a 2013 A6 in the State of Arizona.

8.      Plaintiff Michael Gilburd is a citizen of the State of Arizona who acquired a 2014 A8 in the State of Arizona.

9.      Plaintiff Leslie Cohen is a citizen of the State of Pennsylvania who acquired a 2015 A6 in the State of Arizona.

10.     Plaintiff Pavel Antseliovch is a citizen of the State of Arizona who acquired a 2015 A8 in the State of Arizona.

11.     Plaintiff Vasile Pop is a citizen of the State of Alaska who acquired a 2016 A8L in the State of Arizona.

12.     Plaintiff Daniel Nascarella is a citizen of the State of Arizona who acquired a 2016 A7 in the State of Arizona.

13.     Plaintiff Jeffrey Ullman is a citizen of the State of Arizona who acquired a 2016 A7 in the State of Arizona.

14.     Plaintiff Peter Kreymerman is a citizen of the State of North Carolina who acquired a 2012 A6 in the State of Arizona.

### The Connecticut Plaintiffs

15.     Plaintiff Chiahan Lee is a citizen of the State of Connecticut who acquired a 2012 A6 in the State of Connecticut.

16.     Plaintiffs Michael Medeiros and Camilla Medeiros are citizens of the State of Connecticut who acquired a 2012 A6 in the State of Connecticut.

17.     Plaintiff Sam Eisner is a citizen of the State of Connecticut who acquired a 2012 A7 in the State of Connecticut.

18.     Plaintiff Andrew Messina is a citizen of the State of Connecticut who acquired a 2012 A7 in the State of Connecticut.

19.     Plaintiff Timothy Giguere is a citizen of the State of Massachusetts who acquired a 2013 A6 in the State of Connecticut.

20.     Plaintiff Leo Blais is a citizen of the State of Rhode Island and Bev Lee LLC is a business of the State of Rhode Island who acquired a 2013 A8 in the State of Connecticut.

21.     Plaintiff Radhy Pena is a citizen of the State of Massachusetts who acquired a 2013 A8 in the State of Connecticut.

22.     Plaintiff Howard Weisman is a citizen of the State of Connecticut who acquired a 2013 Q5 in the State of Connecticut.

23.     Plaintiff Joseph Ceravone is a citizen of the State of Connecticut who acquired a 2014 A8 in the State of Connecticut.

24.     Plaintiff Doren Perruccio is a citizen of the State of Connecticut who acquired a 2015 A6 in the State of Connecticut.

25.     Plaintiff Phillis MacDonald is a citizen of the State of New York who acquired a 2015 A8 in the State of Connecticut.

26.     Plaintiff Scott Ragaglia is a citizen of the State of Connecticut who acquired a 2015 A8 in the State of Connecticut.

27.     Plaintiff Rob Quish is a citizen of the State of New York who acquired a 2013 A6 in the State of Connecticut.

### The Florida Plaintiffs

28.     Plaintiff Walter Alvarado is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

29.     Plaintiff Cathy Carpenter is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

30.     Plaintiff Stephen Courson is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

31.     Plaintiff Pamela Deane is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

32.     Plaintiff Charles DeSanti is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

33.     Plaintiffs Michael Field and Donna Field are citizens of the State of Florida who acquired a 2012 A6 in the State of Florida.

34.     Plaintiffs Lenice Graham and Latarsha Mapp are citizens of the State of Florida who acquired a 2012 A6 in the State of Florida.

35.     Plaintiff Ana Martinez and Patricia Vega are citizens of the State of Florida who acquired a 2012 A6 in the State of Florida.

36.     Plaintiff Steve Perrigo is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

37.     Plaintiff Timothy White is a citizen of the State of Florida who acquired a 2012 A6 in the State of Florida.

38.     Plaintiff Zalman Bacheikov is a citizen of the State of Florida who acquired a 2012 A7 in the State of Florida.

39.     Plaintiff David Silver is a citizen of the State of Florida who acquired a 2012 A7 in the State of Florida.

40.     Plaintiff John Dahdouh is a citizen of the State of Florida who acquired a 2012 A8 in the State of Florida.

41.     Plaintiff Sharon McDuffie is a citizen of the State of South Carolina who acquired a 2012 A8 in the State of Florida.

42.     Plaintiff Steven Ritz is a citizen of the State of Florida who acquired a 2012 A8 in the State of Florida.

43.     Plaintiffs John Cornell and Judith Cornell are citizens of the State of Florida who acquired a 2013 A6 in the State of Florida.

44.     Plaintiff Frederick Wenham is a citizen of the State of Florida who acquired a 2013 A6 in the State of Florida.

45.     Plaintiff Pam West is a citizen of the State of Florida who acquired a 2013 A6 in the State of Florida.

46.     Plaintiff Marc Zipper is a citizen of the State of Florida who acquired a 2013 A6 in the State of Florida.

47.     Plaintiff Jonathan Carroll is a citizen of the State of Florida who acquired a 2013 A7 in the State of Florida.

48.     Plaintiff Jaime Valencia is a citizen of the State of Florida who acquired a 2013 A7 in the State of Florida.

49.     Plaintiff Jamie Webster is a citizen of the State of Florida who acquired a 2013 A7 in the State of Florida.

50.     Plaintiffs Ernesto Pozo and Maria Pozo are citizens of the State of Florida who acquired a 2013 A8 in the State of Florida.

51.     Plaintiff Patrick Roark is a citizen of the State of Florida who acquired a 2013 A8 in the State of Florida.

52.     Plaintiff Valerie Zinna is a citizen of the State of Florida who acquired a 2013 A8 in the State of Florida.

53.     Plaintiff Jill Kantor is a citizen of the State of Florida who acquired a 2013 Q5 in the State of Florida.

54.     Plaintiff David Linginski is a citizen of the State of Florida who acquired a 2013 Q5 in the State of Florida.

55.     Plaintiff Bradley Retherford is a citizen of the State of Florida who acquired a 2013 Q5 in the State of Florida.

56.     Plaintiff Alexander Bahadori is a citizen of the State of Florida who acquired a 2014 A6 in the State of Florida.

57.     Plaintiff Peter Fanous is a citizen of the State of Florida who acquired a 2014 A6 in the State of Florida.

58.     Plaintiff Maria Lopez is a citizen of the State of Florida who acquired a 2014 A6 in the State of Florida.

59.     Plaintiffs Stanley Silber and Susan Silber are citizens of the State of Florida who acquired a 2014 A6 in the State of Florida.

60.     Plaintiff Allan Sokol is a citizen of the State of Florida who acquired a 2014 A6 in the State of Florida.

61.     Plaintiffs Warren Whittaker and Karen Whittaker are citizens of the State of Florida who acquired a 2014 A6 in the State of Florida.

62.     Plaintiff Randy Wolters is a citizen of the State of Florida who acquired a 2014 A6 in the State of Florida.

63.     Plaintiff Jacqueline Barnett is a citizen of the State of Florida who acquired a 2014 A7 in the State of Florida.

64.     Plaintiffs Tamara Boughter and Lisa Adair are citizens of the State of Florida who acquired a 2014 A7 in the State of Florida.

65.     Plaintiff Marc Friedman is a citizen of the State of Florida who acquired a 2014 A7 in the State of Florida.

66.     Plaintiff Seymour Kantor is a citizen of the State of Florida who acquired a 2014 A7 in the State of Florida.

67.     Plaintiff Joseph Sloboda is a citizen of the State of Florida who acquired a 2014 A7 in the State of Florida.

68.     Plaintiff LJ Mahon is a citizen of the State of Florida who acquired a 2014 Q5 in the State of Florida.

69.    Plaintiff Patricia Prodesky is a citizen of the State of Florida who acquired a 2014 Q5 in the State of Florida.

70.    Plaintiff Ben Donnelly is a citizen of the State of Florida who acquired a 2015 A6 in the State of Florida.

71.    Plaintiff Oliver Jenkins is a citizen of the State of Florida who acquired a 2015 A6 in the State of Florida.

72.    Plaintiff Timothy Reed is a citizen of the State of Florida who acquired a 2015 A6 in the State of Florida.

73.    Plaintiff Lorraine Hixson is a citizen of the State of Florida who acquired a 2015 A8 in the State of Florida.

74.    Plaintiff David Lozier is a citizen of the State of Florida who acquired a 2015 A8 in the State of Florida.

75.    Plaintiff Edward Rodriguez is a citizen of the State of Florida who acquired a 2015 A8 in the State of Florida.

76.    Plaintiff John Anderson is a citizen of the State of Florida who acquired a 2016 A6 in the State of Florida.

77.    Plaintiffs Jason Andis and Rodiana Andis are citizens of the State of Florida who acquired a 2016 A6 in the State of Florida.

78.    Plaintiffs James Burke and Susan Burke are citizens of the State of Florida who acquired a 2016 A6 in the State of Florida.

79.    Plaintiff Angelina Fearn is a citizen of the State of Florida who acquired a 2016 A6 in the State of Florida.

80.     Plaintiff Matthew Jacocks is a citizen of the State of Florida who acquired a 2016 A7 in the State of Florida.

81.     Plaintiffs Thaddeus Shorette and Kimberly Shorette are citizens of the State of Florida who acquired a 2016 A7 in the State of Florida.

82.     Plaintiff Patricia Gonzalez is a citizen of the State of Florida who acquired a 2016 Q5 in the State of Florida.

83.     Plaintiff Matthew Wallace is a citizen of the State of Florida who acquired a 2016 Q5 in the State of Florida.

84.     Plaintiff April Sharp is a citizen of the State of Florida who acquired a 2015 SQ5 in the State of Florida.

85.     Plaintiff Gregory Otto is a citizen of the State of Florida who acquired a 2013 A6 in the State of Florida.

86.     Plaintiff Ronald Simon is a citizen of the State of Florida who acquired a 2013 A6 in the State of Florida.

### The Idaho Plaintiff

87.     Plaintiff Darrel Cherry is a citizen of the State of Idaho who acquired a 2013 A6 in the State of Idaho.

### The Kansas Plaintiffs

88.     Plaintiff Vincent Farha is a citizen of the State of Kansas who acquired a 2015 A6 in the State of Kansas.

89.     Plaintiff Cody Campbell is a citizen of the State of Kansas who acquired a 2016 A7 in the State of Kansas.

90.     Plaintiff Adam Emo is a citizen of the State of Kansas who acquired a 2016 A7 in the State of Kansas.

### The Kentucky Plaintiffs

91.     Plaintiff Christopher Smith is a citizen of the State of Kentucky who acquired a 2012 A6 in the State of Kentucky.

92.     Plaintiff Lisa Smith is a citizen of the State of Kentucky who acquired a 2014 Q5 in the State of Kentucky.

### The Louisiana Plaintiffs

93.     Plaintiff Michael Kavanaugh is a citizen of the State of Louisiana who acquired a 2013 A8 in the State of Louisiana.

94.     Plaintiff Kyle Wild is a citizen of the State of Louisiana who acquired a 2013 A8 in the State of Louisiana.

95.     Plaintiff Kyle Adams is a citizen of the State of Mississippi who acquired a 2014 A6 in the State of Louisiana.

96.     Plaintiffs Karl Wulf and Maritza Wulf are citizens of the State of Louisiana who acquired a 2015 A8 in the State of Louisiana.

97.     Plaintiff Chris Falk is a citizen of the State of Louisiana who acquired a 2014 A7 in the State of Louisiana.

### The Minnesota Plaintiffs

98.     Plaintiff Jared Grunig is a citizen of the State of Minnesota who acquired a 2012 A6 in the State of Minnesota.

99.     Plaintiff Khosrow Samadani is a citizen of the State of Minnesota who acquired a 2015 Q5 in the State of Minnesota.

## **The New York Plaintiffs**

100.    Plaintiff Deandre Allen is a citizen of the State of New York who acquired a 2012 A6 in the State of New York.

101.    Plaintiff Martin Johnson is a citizen of the State of Georgia who acquired a 2012 A6 in the State of New York.

102.    Plaintiff Daniel Kaplan is a citizen of the State of New York who acquired a 2012 A6 in the State of New York.

103.    Plaintiff Larthonia Redden is a citizen of the State of New York who acquired a 2012 A6 in the State of New York.

104.    Plaintiff Robert Slochover is a citizen of the State of New York who acquired a 2012 A6 in the State of New York.

105.    Plaintiff Brett Dunne is a citizen of the State of New York who acquired a 2012 A7 in the State of New York.

106.    Plaintiff Alfred Chilampath is a citizen of the State of Pennsylvania who acquired a 2013 A6 in the State of New York.

107.    Plaintiff Marc Klementowski is a citizen of the State of New York who acquired a 2013 A6 in the State of New York.

108.    Plaintiff LeJuan Moffatt is a citizen of the State of New York who acquired a 2013 A6 in the State of New York.

109.    Plaintiff Helaine Worrell is a citizen of the State of New York who acquired a 2013 A8 in the State of New York.

110.    Plaintiff Armando Desousa is a citizen of the State of New York who acquired a 2013 Q5 in the State of New York.

111.    Plaintiff William Hallett is a citizen of the State of New York who acquired a 2013 Q5 in the State of New York.

112.    Plaintiff Fahrudin (Frank) Omerovic is a citizen of the State of New York who acquired a 2014 A6 in the State of New York.

113.    Plaintiff Jeffrey Vanefsky is a citizen of the State of New York who acquired a 2014 A8 in the State of New York.

114.    Plaintiff Yvette Hinds is a citizen of the State of New York who acquired a 2014 Q5 in the State of New York.

115.    Plaintiff Kenneth Plotkin is a citizen of the State of New York who acquired a 2014 Q5 in the State of New York.

116.    Plaintiff Ricardo Santos is a citizen of the State of New York who acquired a 2014 Q5 in the State of New York.

117.    Plaintiff Ekaterini Tsirkas is a citizen of the State of New York who acquired a 2014 Q5 in the State of New York.

118.    Plaintiff Alex Silverman is a citizen of the State of New York who acquired a 2015 A6 in the State of New York.

119.    Plaintiff Martin Schwartz is a citizen of the State of New York who acquired a 2015 A7 in the State of New York.

120.    Plaintiff Michael Digiuseppi is a citizen of the State of New York who acquired a 2016 A6 in the State of New York.

121.    Plaintiff Jimmy Georgilis is a citizen of the State of New York who acquired a 2016 A6 in the State of New York.

122.    Plaintiff Brad Green is a citizen of the State of New York who acquired a 2016 A6 in the State of New York.

123.    Plaintiff David Elkouby is a citizen of the State of New York who acquired a 2016 A6 in the State of New York.

124.    Plaintiff Gary Dell'Abate is a citizen of the State of Connecticut who acquired a 2016 Q5 in the State of New York.

125.    Plaintiff Eriz Yellinek is a citizen of the State of New York who acquired a 2014 SQ5 in the State of New York.

126.    Plaintiff Sorell Gramada is a citizen of the State of Ohio who acquired a 2014 A8 in the State of New York.

127.    Plaintiff Robin Meshonek is a citizen of the State of New York who acquired a 2015 Q5 in the State of New York.

128.    Plaintiff David Gleason is a citizen of the State of New York who acquired a 2012 A6 in the State of New York.

## The Rhode Island Plaintiffs

129.    Plaintiff Niclas Erhardt is a citizen of the State of Maine who acquired a 2013 Q5 in the State of Rhode Island.

130.    Plaintiff Robert Sheehan is a citizen of the State of Florida who acquired a 2014 A7 in the State of Rhode Island.

131.    Plaintiff Robert Loiselle is a citizen of the State of Rhode Island who acquired a 2014 A8 in the State of Rhode Island.

132.    Plaintiff Joseph Del Sesto is a citizen of the State of Rhode Island who acquired a 2016 A6 in the State of Rhode Island.

133.     Plaintiff Denis Martin is a citizen of the State of Rhode Island who acquired a 2016 A6 in the State of Rhode Island.

## The Tennessee Plaintiffs

134.     Plaintiff Vincent Batson is a citizen of the State of Tennessee who acquired a 2012 A6 in the State of Tennessee.

135.     Plaintiffs Melvin Hines and Debra Hines are citizens of the State of Tennessee who acquired a 2012 A6 in the State of Tennessee.

136.     Plaintiff Dennis Jenkins is a citizen of the State of Alabama who acquired a 2012 A6 in the State of Tennessee.

137.     Plaintiff Ronald Ward is a citizen of the State of Tennessee who acquired a 2012 A8 in the State of Tennessee.

138.     Plaintiff Iouda Enapay is a citizen of the State of Texas who acquired a 2013 A6 in the State of Tennessee.

139.     Plaintiff Michael Rogers is a citizen of the State of Tennessee who acquired a 2014 A8 in the State of Tennessee.

140.     Plaintiff Jim Vaughn is a citizen of the State of Tennessee who acquired a 2015 A6 in the State of Tennessee.

141.     Plaintiff Lance Wilson is a citizen of the State of Tennessee who acquired a 2015 A8 in the State of Tennessee.

142.     Plaintiff Timothy Kuhlman is a citizen of the State of Tennessee who acquired a 2016 Q5 in the State of Tennessee.

143.     Plaintiff Jessica Neal is a citizen of the State of Tennessee who acquired a 2014 SQ5 in the State of Tennessee.

**The Wisconsin Plaintiffs**

144.    Plaintiff Ken Szafranski is a citizen of the State of Wisconsin who acquired a 2012 A6 in the State of Wisconsin.

145.    Plaintiff Ronald Nemke is a citizen of the State of Wisconsin who acquired a 2013 A6 in the State of Wisconsin.

146.    Plaintiff Jacob Moreno is a citizen of the State of Wisconsin who acquired a 2012 A6 in the State of Wisconsin.

**DEFENDANTS**

147.    Volkswagen Aktiengesellschaft ("VW AG") is a German corporation with its principal place of business at Berliner Ring 2, 38440 Wolfsburg, Germany.  VW AG may be served with process through its wholly owned U.S. subsidiary, Volkswagen Group of America, Inc., 2200 Ferdinand Porsche Dr., Herndon, VA 20171.  VW AG may be served with process either by serving any officer or director of Volkswagen Group of America, Inc., at 2200 Ferdinand Porsche Dr., Herndon, VA 20171 or by serving Volkswagen Group of America, Inc. through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

148.    Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VW America may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.  VW America is a wholly-owned subsidiary of VW AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.

149.    Audi Aktiengesellschaft ("Audi AG") is a German corporation with its principal place of business at Auto-Union-Straße 1, 85045 Ingolstadt, Germany.  Audi AG may be served with process in this lawsuit at Audi Aktiengesellschaft, Postfach 10 04 57, 85045 Ingolstadt, Germany.

150.    Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi America may be served with process at 2200 Ferdinand Porsche Dr., Herndon, VA 20171.  Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

## AGENCY

151.    At all relevant times to the allegations in this lawsuit, VW America, Audi AG, and Audi America were the agents of VW AG and all misrepresentations at issue in this lawsuit and described below in more detail were made with knowledge and intent by VW AG, VW America, Audi AG, and Audi America that the misrepresentations would be repeated to third-parties, like Plaintiffs, and that such third-parties would rely on them.

152.    For purposes of this Complaint, VW AG, VW America, Audi AG, and Audi America shall collectively be referred to as "Defendants," the "Audi Gasoline Defendants," or "Audi."

## JURISDICTION AND VENUE

153.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court further has original subject-matter jurisdiction over this

action under 28 U.S.C. § 1331 (federal question) and has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

154.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

155.    Personal jurisdiction over VW America and Audi America is proper in Virginia because both are corporates citizen of Virginia, VW America has registered to do business with the Virginia State Corporation Commission, and both VW America and Audi America maintain their principle places of business in Fairfax County, Virginia.  This Court also has jurisdiction over Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce numerous automobiles, including the automobiles at issue in this case.  In addition, the fraudulent statements and omissions occurred, in part, in this district. Defendants also conduct business in Virginia and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in Virginia.  Personal jurisdiction is proper in Virginia over Defendants because they caused tortious injury by an act or omission in Virginia and because they transact substantial business in Virginia.

## JURY TRIAL DEMAND

156.    Plaintiffs request a jury trial of this matter.

## FACTUAL BACKGROUND

### The Basics

157.    This lawsuit is about a fraudulent deceptive scheme to deliberately lie, cheat and intentionally deceive consumers about the characteristics, benefits and value of certain automotive vehicles (referred to herein as the "Deceptive Emissions Scheme").  The Deceptive Emissions

Scheme involved a number of Audi gasoline vehicles (collectively referred to as the "Fraudulent Vehicles"), including those acquired by Plaintiffs and described above.

158.    The centerpiece of the Deceptive Emissions Scheme was the use of, in the Fraudulent Vehicles, a secretly embedded software algorithm that was designed and installed to cheat emission tests (herein referred to as the "Cheat Device"), thereby fooling the Environmental Protection Agency ("EPA") and other regulators, into approving the Fraudulent Vehicles for sale and thereby tricking and defrauding consumers into buying and/or leasing more than a hundred thousand vehicles which were, in actuality, non-compliant and illegal to be sold or leased.

159.    The Cheat Device detects when the engines in the Fraudulent Vehicles are being tested in a laboratory or smog station and trigger performance-sapping controls to simulate compliance with emission laws when under testing conditions. But when the test ends, and the driver returns to the road under normal operation and use, the performance—and the illegal pollution—returns.  In short, the Audi Gasoline Defendants figured out a computer-driven methodology and technique to cheat the emissions system – simply run the vehicle in an eco-friendly compliant mode when being tested and in normal dirty mode when it was out on the road ways being driven by consumers.  Plain and simple:  it was an intentional plan, scheme and design to lie and cheat consumers, including Plaintiffs in this lawsuit.

160.    For years, the defendants got away with Deceptive Emissions Scheme, including the Cheat Device, without detection as Fraudulent Vehicles were sold in large numbers into our stream of commerce. Once out of the testing facilities and on the roads, these cars emit harmful levels of Caron Dioxide (CO2) emissions into the air. When being driven on the road, they also emit more NOx and carbon monoxide than the levels reported by emission testing and advertised

by the Audi Gasoline Defendants. When being driven on the road, they also achieve less fuel economy than represented and advertised by the Audi Gasoline Defendants.

161. $CO_2$ is a significant greenhouse gas, and the excessive emission of carbon dioxide is a major cause of global warming and ocean acidification. For this reason, the EPA and CARB regulate emissions of carbon dioxide from vehicles sold in the United States and California.

162. Because of the Audi Gasoline Defendants' actions, the Fraudulent Vehicles that were sold to Plaintiffs are not what the Audi Gasoline Defendants promised. During normal operation, these vehicles pollute the atmosphere with much higher levels of pollutants and greenhouse gases than the artificially-manipulated test results disclose, or than are permitted by federal and state environmental protection laws. Meanwhile, when the engine and transmission are operated in a manner that actually limits pollution as certified and advertised, the vehicles cannot deliver the performance that the Audi Gasoline Defendants promised and advertised.

163. The Audi Gasoline defendants used known fraudulently obtained EPA Certificates of Conformity ("COCs"), as well as California Air Resources Board ("CARB") Executive Orders ("EOs"), to sell and market more than a hundred thousand Fraudulent Vehicles solely in the name of profit and greed. And in trying to quench their need for such, being dishonest, fraudulent and criminal was of no deterrent value and cheating and stealing from their own consumers was of no consideration.

164. Plaintiffs in this lawsuit were duped – plain and simple. They got sucked in by the Defendants' lies and fraudulent scheme and acquired their Fraudulent Vehicles based on the patently false representations that the vehicles had low emissions, got good gas mileage, and complied with federal, state, and local emissions laws and regulations.

165.     All of the defendants in this lawsuit played a role and participated in the Deceptive Emissions Scheme, including the creation, use, and deception related to the Cheat Device.

166.     All of the plaintiffs in this lawsuit acquired one of the Fraudulent Vehicles without knowledge of Deceptive Emissions Scheme or the Cheat Device.

167.     The Deceptive Emissions Scheme, including the Cheat Device, was dastardly.

168.     The Deceptive Emissions Scheme, including the Cheat Device, was criminal.

169.     The Deceptive Emissions Scheme, including the Cheat Device, was intentionally designed to defraud and cheat consumers, including Plaintiffs – which it did.

## Defendants' Scheme to Install Defeat Devices

170.     The history of the Audi Gasoline Defendants' development of the gasoline Cheat Devices is not as publicly known as the history of their now-infamous diesel defeat device that became known as the "Dieselgate" scandal.  From what is known now, though, it appears the Audi Gasoline Defendants developed the Cheat Device at issue in this lawsuit concurrently with their diesel cheat device as part of an overall fraudulent scheme to deal with emissions engineering problems through cheating and deception.

171.     Since 2011, $CO_2$ emissions standards have been increasing, putting increasing pressure on automobile manufacturers, like the Audi Gasoline Defendants, to design and development more environmentally friendly vehicles.

172.     The Audi Gasoline Defendants knew that in order sell the Fraudulent Vehicles in the United States, the vehicles had to meet the relevant standards.  Before introducing a Fraudulent Vehicle into the U.S. stream of commerce (or causing the same), the Audi Gasoline Defendants were required to first apply for, and obtain, an EPA-administered COC, certifying that the vehicle comported with the emission standards for pollutants.  The Clean Air Act ("CAA") expressly

prohibits automakers, like the Audi Gasoline Defendants, from introducing a new vehicle into the stream of commerce without a valid EPA COC. Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. California's emission standards were even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

173.    The CAA prohibits Cheat Devices like the ones installed in the Fraudulent Vehicles. Moreover, in order to obtain a COC, automakers must submit an application that lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device. The Audi Gasoline Defendants fraudulently obtained a COCs and EOs for the Fraudulent Vehicles by hiding the existence of the Cheat Device. In other words, the Audi Gasoline Defendants were marketing and selling to American consumers, including Plaintiffs, vehicles that were illegal to drive.

174.    The Audi Gasoline Defendants were aware that emissions and fuel consumption are decisive factors for customers making vehicle purchase decisions. To that end the Audi Gasoline Defendants began to mislead consumers by representing their vehicles as consuming less fuel and emitting less CO2 and other pollutants than they actually do in normal driving conditions.

175.    The Audi Gasoline Defendants were able to disguise this deception by programming the Fraudulent Vehicles with the ability to engage different modes, one of which used significantly less fuel and emitted significantly less pollutants, but also delivered significantly less power. The Audi Gasoline Defendants deceptively labeled this the "warm-up" strategy, a mode that activates when the Fraudulent Vehicles are started. As long as the "warm-up" function

21

remains activated, the automatic transmission remains in a "switching program" that produces a low engine speed, consumes less fuel, and produces less $CO_2$ and other pollutants. However, this "warm up" mode remains active only until the steering wheel is turned 15 degrees or more, at which point the engine management computer switches the transmission into normal mode, wherein the transmission shifts at normal, higher RPM, offering higher performance, lower fuel economy, and significantly greater carbon dioxide and other pollutant emissions.

176.    During emissions testing, which typically takes place on a dynamometer, the car remains in "warm-up" mode indefinitely, because the steering wheel is not turned. Meanwhile, in normal driving conditions, any turn that requires the steering wheel to be rotated more than 15 degrees, and the car switches to its normal shifting program, resulting in lower fuel economy, and significantly greater carbon dioxide emissions and other pollutants.

177.    In February 2013, the Audi Gasoline Defendants tested their cars in the "SummerFahrt," or Summer Drive, in South Africa. The final report reflected that the shift quality and issues at the start were noticeable. It was in this report that Audi engineer Axel Eiser made his now-notorious comment that the cycle-optimized "shifting program" was to be set to operate 100% when being tested, and be noticeable only .01% of the time when driven normally.

178.    The defeat device software is embedded in the Transmission Control Module ("TCM"). The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work in tandem to execute the actual cheat function. The engineers embedded the cheat software in the TCM unit, intentionally making its detection less probable

179.    Volkswagen and Audi engineers figured out how to activate this low fuel, low emissions, low power "warm-up" mode during emissions tests. They discovered that only time the Fraudulent Vehicles would run continuously with no steering wheel input would be when the vehicles were undergoing examination in a lab, on a dynamometer. When sensors detect these lab conditions, the vehicles' TCM set "shift points"—the engine speeds at which the transmission shifts up to the next gear—that allow the vehicles to produce compliant emission results under those conditions (known by Audi as the "dyno calibration" mode). Thus, on a dynamometer, where the steering wheel is never turned, the Cheat Device enables the Fraudulent Vehicles to operate in this low power mode.

180.    At all other times—that is, when the Fraudulent Vehicles are actually driving under normal conditions—the transmission computer switches to "road calibration" mode, which offers full power to the driver, and which results in increased fuel consumption and greater emissions. Indeed, the road calibration mode activates once the driver turns the steering wheel 15 degrees, something that happens almost immediately under nearly all normal driving conditions.

181.    This Deceptive Emission Scheme allowed the Audi Gasoline Defendants to trick governmental authorities and the public as to the Fraudulent Vehicles' fuel consumption and emissions levels.

182.    A vehicle's advertised fuel economy, which is listed on the "Monroney sticker," or window sticker, is determined by driving a vehicle over five standardized driving patterns (or drive cycles), all of which are performed in a laboratory on a dynamometer where the conditions for all tests can be controlled. During each of the drive cycles, the Fraudulent Vehicles were assessed under a low power, low emissions, low fuel consumption mode.  Based on the way the Monroney sticker is calculated, as the amount of $CO_2$ produced increases, the gasoline used

increases and the fuel economy decreases. Therefore, if a vehicle produces less CO2 during laboratory testing, but higher CO2 when driven on road, the vehicle would have better estimated fuel economy represented on the Monroney sticker than the vehicle would actually achieve on the road. That is exactly what happened here with regard to the Fraudulent Vehicles. The Cheat Device essentially tricked the Monroney testing into giving the false impression that the Fraudulent Vehicles had better mileage and emissions levels than they did.

183.    There is no question that the Audi Gasoline Defendants knew what they were doing. Indeed, they commissioned their own study at one point and found that certain Fraudulent Vehicles' fuel consumption on the road increased by 8.5 percent after the wheel was turned.

184.    The Audi Gasoline Defendants' developed the Cheat Device because they could not deliver all that they promised Plaintiffs with the Fraudulent Vehicles. By improving fuel economy to comply with new, stringent fleet-wide CO2 emissions standards (so that they would be allowed to sell cars in the United States at all), the Audi Gasoline Defendants found that the resulting driving experience was unacceptable in light of its advertised emphasis on performance. The Audi Gasoline Defendants decided to conceal the low-power mode from the consumer, including Plaintiffs, and make it active, in effect, only when the vehicles were undergoing emissions testing—when the steering wheel is not turned. Audi executives were aware of the risk that consumers would complain about the discrepancy between advertised fuel economy achieved during certification testing and what they would experience in the real world but nonetheless elected to conceal the "low-power" mode from consumers and regulators alike.

**The Discovery of the Cheat Device**

185.    In late 2015 or early 2016, German authorities—namely, the German Motor Transportation Authority ("KBA")—detected irregularities and increased CO2 emissions in Audi

vehicles and questioned Audi about these results. The Audi Gasoline Defendants lied to the KBA, however, telling them that their vehicles would not contain software allowing them to detect dynamometer testing and alter the vehicles' performance as a result. The Audi Gasoline Defendants instead pointed to a number of factors that could have distorted the measurement results.

186.    German authorities continued to press forward, however, and renewed their investigations.

187.    Audi executives were on notice of the potential for $CO_2$ emissions manipulation well before the Audi $CO_2$ defeat device was publicized. Following the public revelation of the diesel defeat device in the "Clean Diesel" vehicles in September 2015 by CARB and EPA, another investigation began to unfold, this one relating to $CO_2$. In November 2015, new Volkswagen CEO Matthias Müller announced that internal investigations had identified irregularities in $CO_2$ levels, and that around 800,000 Group vehicles could be affected. A Volkswagen announcement did not specifically identify the vehicles, but stated in relevant part: "…during the course of internal investigations irregularities were found when determining type approval $CO_2$ levels. Based on present knowledge around 800,000 vehicles from the Volkswagen Group could be affected. An initial estimate puts the economic risks at approximately two billion euros. The Board of Management of AG will immediately start a dialogue with the responsible type approval agencies regarding the consequences of these findings."

188.    In December 2015, in a statement to investors, Mueller changed course, reporting that the Audi Gasoline Defendants had in fact made a mistake and that there was no such scandal. It was announced that "[t]he suspicion that fuel consumption figures of current production vehicles

had been unlawfully changed was not confirmed…These cars can be offered for sale by dealers without any reservations."

189.    More than half a year later, European officials again questioned Defendants about carbon emissions. Even then, Defendants continued to deny a problem. At no point in time did the Audi Gasoline Defendants inform the public or Plaintiffs that they had obtained the COCs and EOs through the use of a $CO_2$ defeat device, or that its emissions and fuel efficiency representations for the Fraudulent Vehicles were false.

190.    Since at least 2013 at Audi and Volkswagen executives were aware and concerned about the $CO_2$ defeat device—including the fact that the software constituted a defeat device—and the risk of regulatory investigations.  Moreover, Volkswagen's now-former CEO, Martin Winterkorn, knew about the defeat device scheme well before the scandal broke.  Indeed, prosecutors in Germany, are investigating Winterkorn for fraud, believing he had sufficient knowledge of the scheme.

191.    Following the revelations regarding the $CO_2$ defeat device, Audi reportedly suspended several unidentified "responsible engineers." However, Axel Eiser remains Head of Powertrain Development of the Volkswagen Group. Defendants have even relied on Eiser to interface with regulators.

**Publicly Revealed Testing Confirms the Existence of the Cheat Device**

192.    Recently, testing of Fraudulent Vehicles by private parties has been made public in court filings.  This testing confirms the existence and functionality of the Cheat Device.

193.    Testing was conducted to determine whether there was a difference in fuel economy for certain Fraudulent Vehicles when tested using the federal certification tests, with and without turning the vehicle wheels more than 15 degrees prior to testing.  Test results showed that

in certain Fraudulent Vehicles, fuel economy was higher with no wheel movement before testing than in testing that followed moving the steering wheel fully to the right and left after engine start and just prior to the drive cycle starting, indicating that steering input triggers a switch between modes. The difference in fuel economy was as high as nine percent between the two modes.

194.    Further testing  shows the existence of a defeat device that increases fuel economy (reducing carbon dioxide production) when the steering wheel is not turned, and that it does so by instructing the transmission to shift at lower engine speed, operating at a lower average RPM.

195.    There has also been testing of Fraudulent Vehicles that have been "reflashed" with a software update as part of an emissions recall that received regulatory approval on September 16, 2016.  Further, experts have conducted on-road testing on several 3.0L Fraudulent Vehicles using portable emissions measurement systems ("PEMS").  These tests support conclusion that the Fraudulent Vehicles are equipped with Cheat Devices.

### Defendants' False Advertising

196.    In addition to directly falsely advertising to Plaintiffs emissions compliance and fuel economy regarding the Fraudulent Vehicles, the Audi Gasoline Defendants advertised their concern for the environment even while selling vehicles equipped with Defeat Devices that polluted at levels far greater than legal limits. For example, on the "Environment" page of its website, Volkswagen Group of America, Inc., stated as late as September 2015 that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives." That "integrated strategy" for reducing emissions seems to

have consisted only of cheating emissions testing so that Volkswagen and Audi vehicles only appeared to offer reduced emissions, while continuing to pollute.

197.    Long after Defendants became aware that many of their vehicles were deliberately designed to cheat emissions tests, and even after EPA and CARB issued Notices of Violation for their diesel vehicles, Defendants continued to mislead consumers. While sales of new diesel vehicles equipped with the diesel defeat device ceased in late 2015, news reports indicate that Audi did not stop producing gasoline vehicles equipped with the Cheat Device until May 2016, a full eight months after the 2015 diesel scandal broke.

198.    Audi television advertisements use the tagline "Truth in Engineering" as their motto.  Unfortunately for consumers who bought the Fraudulent Vehicles, the Audi Gasoline Defendants' engineering was far from "truthful," and their professed commitment to environmental consciousness was illusory.  They have designed and sold cars that emit pollutants at breath-taking levels, and they disguised it by engineering them to detect and then cheat on state and federal environmental testing.

**Defendants Intentionally Hid the Excessive Pollution Emitted By the Fraudulent Vehicles.**

199.    Defendants' Defeat Devices are part of a computerized engine control system that monitors sensors throughout the cars' engine, transmission, and exhaust systems and controls operation of the cars' systems to ensure optimal performance. Here, the Audi Gasoline Defendants programmed the engine control computers in the Fraudulent Vehicles with software that effectively detects when the vehicle is undergoing emissions testing by turning off a low-emitting gear-shifting program only once the steering wheel is turned more than fifteen degrees. This ensures that the engine never revs above a certain, unrealistically low engine speed during emissions testing, resulting in less fuel burnt and less carbon dioxide emitted than under normal

driving conditions. When the car is not being emissions tested—that is, under the vast majority of normal operating conditions—the engine control systems operate the engine and transmission in a manner that does not comply with EPA or CARB emissions requirements.

200.    In short, this software allows the Fraudulent Vehicles to meet emissions standards in labs or state testing stations while permitting the vehicles to emit carbon dioxide at levels far above the standard allowed under United States laws and regulations during normal operation.

201.    The Audi Gasoline Defendants have a history of cheating on emissions. The "Dieselgate" Scandal was not the first time that the Audi Gasoline Defendants allegedly engineered vehicles to cheat emission standards. Volkswagen paid a $120,000 fine to the EPA in 1974 in order to settle charges that "it gamed pollution control systems in four models by changing carburetor settings and shutting off an emissions-control system at low temperatures."

202.    Moreover, Defendants were warned as long ago as 2007 by suppliers and their own employees not to cheat on emissions tests. In 2007, supplier Bosch warned the Defendants not to use cheat software during regular operation. Also, in 2011, a technician raised concerns about illegal practices in connection with emissions levels.

203.    Despite those warnings, the Audi Gasoline Defendants manufactured, marketed, and sold cars with Defeat Devices designed to allow higher levels of pollutant emissions than those allowed by state and federal law, thus defrauding their customers, including Plaintiffs.

**The Deceptive Emissions Scheme Caused Extensive Harm to Plaintiffs.**

204.    The Deceptive Emissions Scheme duped Plaintiffs and consumers into acquiring Fraudulent Vehicles that never should have left the factory, let alone been sold.

205.    In addition, a premium was charged for the Fraudulent Vehicles, as compared to non-luxury, high performance vehicles.

206.    Plaintiffs acquired their Fraudulent Vehicles based on Defendants' fraudulently obtained COCs from the EPA to induce Plaintiffs to acquire these vehicles. Plaintiffs also acquired their vehicles based on Defendant's false representations and advertisements regarding performance and fuel economy.  Plaintiffs acquired the Fraudulent Vehicles based on these claims, and were harmed as a result.

207.    Defendants' illegal and deceptive actions have caused Plaintiffs significant harm. Even if Defendants were to repair the Fraudulent Vehicles so that they comply with emissions requirements, the repair would not compensate Plaintiffs for the significant harm Defendants' deception has caused.  First, any repairs performed as part of the recall are likely to significantly diminish the performance (and thus the value) of the Fraudulent Vehicles. Specifically, any software "repair" that reprograms the Fraudulent Vehicles to operate within legal emissions limits at all times (and not just during testing) will cause the performance of the Fraudulent Vehicles to suffer, and they will not perform as they were advertised and marketed to Plaintiffs.

208.    Second, even if a more functional repair is possible (and to date none has been suggested), it could not compensate for the financial damages Plaintiffs have suffered, including the premiums Plaintiffs paid to own high-performing, luxurious Audi-branded vehicles that complied with emissions requirements and comported with Audi's advertised commitment to the environment and the inevitable reduction in resale value caused by any recall to repair the vehicles and any resulting diminished performance.

209.    Third, Plaintiffs are already experiencing reputational harm as they are unwilling accomplices to Defendants' pollution-producing scheme.

210.    For those reasons, as a result of Defendants' unfair, deceptive, and fraudulent business practices, and their failure to disclose that the Fraudulent Vehicles utilize a Cheat Device

to cheat emissions tests, owners and/or lessees of the Fraudulent Vehicles, including Plaintiffs, have suffered losses in money and property.

211.     Had Plaintiffs known of the Cheat Device at the time they acquired their Fraudulent Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

212.     Plaintiffs have suffered damages as a result their purchases of the Vehicles, including but not limited to (i) overpayment for a vehicle that is incapable of performing as represented, (ii) future additional fuel costs, (iii) loss of performance from future repairs, and (iv) diminution of vehicle value.

213.     In sum, Defendants' deliberate strategy to value profit over the truth, human health, and the environment, has caused serious harm to consumers nationwide.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

214.     The tolling doctrine was made for cases of fraudulent concealment like this one. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that the defendants had conspired to install software that would evade emissions regulations, and that the defendants were concealing and misrepresenting the true emissions levels of its vehicles.

215.     The fraud, as set forth herein, was elaborate and well concealed.

216.     Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

217.    Plaintiffs could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers.

218.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of their sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs immediately before this action was filed.

**Fraudulent Concealment**

219.    All applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

220.    Upon information and belief, prior to the date of this Complaint and before any Plaintiff acquired his or her Fraudulent Vehicle, if not earlier, the Audi Gasoline Defendants knew of the Cheat Device in the Fraudulent Vehicles, but continued to distribute, sell, and/or lease the Fraudulent Vehicles to Plaintiffs. In doing so, Defendants concealed and expressly denied the existence of problem with $CO_2$ emissions, and/or failed to notify Plaintiffs about the true nature of the vehicles.

221.    Instead of disclosing their deception, or that the emissions from the Fraudulent Vehicles were far worse than represented, Defendants falsely represented that their vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

222.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge active concealment of the facts alleged herein.

**Estoppel**

223.    Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Fraudulent Vehicles, including their emissions systems and their compliance with applicable federal and state law.

224.    Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Fraudulent Vehicles, actively concealed the true character, quality, and nature of the Fraudulent Vehicles, and knowingly made misrepresentations about the quality, reliability, characteristics, and/or performance of the Vehicles.

**American Pipe Tolling**

225.    Under the U.S. Supreme Court's decision in A*merican Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, any applicable statutes of limitation were tolled by the filing of the federal class action complaint in In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, 3:15-md-02672-CRB (N.D. Cal.).

226.    Based on the foregoing, the Audi Gasoline Defendants are estopped and precluded from relying on any statute of limitations in defense of this action.

## CLAIMS FOR RELIEF

**FEDERAL COUNT 1-**
**Violations of 15 U.S.C. §§ 2301, *et seq.*,**
**The Magnuson-Moss Warranty Act ("MMWA")**
**(On behalf of all Plaintiffs)**

227.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

228. This Count is brought on behalf of all Plaintiffs.

229. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).V

230. Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

231. The Fraudulent Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

232. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

233. Defendants provided Plaintiffs with the following two express warranties, which are covered under 15 U.S.C. § 2301(6):

   a. Manufacturer's Warranty—This written warranty provides "bumper-to-bumper" limited express warranty overage for a minimum of 3 years or 36,000 miles, whichever comes first. The warranty covers emissions related repairs.

   b. Federal Emissions Warranty—Consistent with federal law, the Volkswagen provided a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover the repair and replacement of: all emission control and emission-related parts for two years or 24,000 miles (whichever comes first); and specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

234. The Fraudulent Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

235. Defendants breached these warranties as described in more detail above. Without limitation, the Fraudulent Vehicles share a common design defect in that they emit more pollutants than (a) is allowable under the applicable regulations and (b) Defendant repeatedly represented were emitted to their customers, the public, and regulators.

236. Defendants have admitted that the Fraudulent Vehicles are illegal, defective, and of lesser quality than advertised.

237.    Plaintiffs have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between the Defendants, on the one hand, and Plaintiffs, on the other hand.  Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Defendants or their dealers, and of their implied warranties. The dealers were not intended to be the ultimate users of the Fraudulent Vehicles and have no rights under the warranties provided with the Fraudulent Vehicles; the warranties were designed for and intended to benefit consumers only.

238.    Affording Defendants a reasonable opportunity to cure their breach of warranties would be unnecessary and futile.  At the time of sale or lease of each Fraudulent Vehicle, Defendants knew of the misrepresentations concerning the Fraudulent Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs submit to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

239.    Plaintiffs would suffer economic hardship if they returned their Fraudulent Vehicles, but did not receive the return of all payments made by them to Defendants.  Because Defendants are refusing to acknowledge any revocation of acceptance and have not immediately returned any payments made, Plaintiffs have not re-accepted their Fraudulent Vehicles by retaining them.

240.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs seek all damages permitted by law, including, without limitation, diminution in the value of their vehicles,

in an amount to be proven at trial.

## STATE LAW CLAIMS

## ARKANSAS

241.    Plaintiffs Eddie Higgins, David Lupo, Susan Lupo, and David Mcleod (collectively, the "Arkansas Plaintiffs") acquired their Fraudulent Vehicles while in the State of Arkansas.   As such, they bring the following causes of action against all defendants.

## ARKANSAS COUNT 1- FRAUD
(On behalf of the Arkansas Plaintiffs)

242.    The Arkansas Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

243.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Arkansas Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

244.    The Audi Gasoline Defendants valued their profits over the trust that the Arkansas Plaintiffs entrusted to them. The Arkansas Plaintiffs bought their cars from the Audi Gasoline

Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

245. Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Arkansas Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

246. Defendants' false representations and omissions were material to the Arkansas Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Arkansas Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

247. The Arkansas Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Arkansas Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Arkansas Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

248. Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Arkansas Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Arkansas Plaintiffs.

249.    Defendants had a duty to disclose the Cheat Device to the Arkansas Plaintiffs.

250.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Arkansas Plaintiffs, did not know about (and could not reasonably discover) its scheme.

251.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Arkansas Plaintiffs.

252.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

253.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Arkansas Plaintiffs.

254.    The Arkansas Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

255.    The Arkansas Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Arkansas Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

256.    As a direct and proximate result of Defendants' fraudulent scheme, the Arkansas Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

257.    The Arkansas Plaintiffs hereby sue Defendants for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial.   Defendants' wrongful conduct was willful or so reckless as to be equivalent thereto. Defendants' conduct thus warrants substantial punitive damages law in an amount to be determined at trial, for which the Arkansas Plaintiffs hereby sue Defendants.

**ARKANSAS COUNT 2-**
**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT**
**(Ark. Code Ann. § 4-88-101, et seq.)**
**(On behalf of the Arkansas Plaintiffs)**

258.    The Arkansas Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

259.    The Arkansas Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

260.    Defendants and the Arkansas Plaintiffs are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

261.    The Fraudulent Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88- 102(4).

262.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108. Defendants intentionally violated the aforementioned provisions of the Arkansas DTPA.

263.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy

test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Arkansas Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

264.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Arkansas DTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

265.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

266.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

267.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Arkansas Plaintiffs.

268.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

269.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Arkansas DTPA.

270.    Defendants owed the Arkansas Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.    intentionally concealed the foregoing from the Arkansas Plaintiffs; and/or

   c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Arkansas Plaintiffs that contradicted these representations.

271.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

272.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Arkansas Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

42

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

273.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Arkansas Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

274.    The Arkansas Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Arkansas Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Arkansas Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

275.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arkansas DTPA in the course of their business.

276.    Defendants' violations present a continuing risk to the Arkansas Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

277.    The Arkansas Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment,

humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. The Arkansas Plaintiffs also sue Defendants for punitive damages because Defendants acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.  The Arkansas Plaintiffs further sue Defendants for attorneys' fees and costs plus any other just and proper relief available under the Arkansas DTPA. *See Anderson v. Stewart*, 234 S.W.3d 295, 297 (2006).

## ARIZONA

278.     Plaintiffs Yotam Benami, Michael Castro, Catherine Castro, Robert Plous, Emerald Greig, Michael Gilburd, Leslie Cohen, Pavel Antseliovch, Vasil Pop, Daniel Nascarella, Jeffrey Ullman, and Peter Kreymerman (collectively, the "Arizona Plaintiffs") acquired their Fraudulent Vehicles while in the State of Arizona.   As such, they bring the following causes of action against all defendants.

### ARIZONA COUNT 1- FRAUD
### (On behalf of the Arizona Plaintiffs)

279.     The Arizona Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

280.     As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Arizona Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and

represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

281.    The Audi Gasoline Defendants valued their profits over the trust that the Arizona Plaintiffs entrusted to them. The Arizona Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

282.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Arizona Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

283.    Defendants' false representations and omissions were material to the Arizona Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Arizona Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

284.    The Arizona Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Arizona Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Arizona Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

285.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Arizona Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Arizona Plaintiffs.

286.    Defendants had a duty to disclose the Cheat Device to the Arizona Plaintiffs.

287.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Arizona Plaintiffs, did not know about (and could not reasonably discover) its scheme.

288.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Arizona Plaintiffs.

289.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal

emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

290.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Arizona Plaintiffs.

291.    The Arizona Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

292.    The Arizona Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Arizona Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

293.    As a direct and proximate result of Defendants' fraudulent scheme, the Arizona Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

294.     The Arizona Plaintiffs hereby sue Defendant for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial. Defendants' defendant's wrongful conduct was guided by evil motives or willful or wanton disregard of the interests of others.  Defendants' conduct thus warrants substantial punitive damages in an amount to be determined at trial, for which the Arizona Plaintiffs hereby sue Defendants.

**ARIZONA COUNT 2-**
**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. § 44-1521, et seq.)**
**(On behalf of the Arizona Plaintiffs)**

295.     The Arizona Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

296.     The Arizona Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

297.     Defendants and the Arizona Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

298.     The Fraudulent Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

299.     The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A). Defendants intentionally violated the Arizona CFA.

300.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Arizona Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

301.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Arizona CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

302.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

303.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the

law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

304.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Arizona Plaintiffs.

305.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

306.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Arizona CFA.

307.    Defendants owed the Arizona Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Arizona Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Arizona Plaintiffs that contradicted these representations.

308.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

309.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Arizona Plaintiffs.  A vehicle made by a

reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

310.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Arizona Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

311.    The Arizona Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Arizona Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Arizona Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

312.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business.

313.    Defendants' violations present a continuing risk to the Arizona Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

314.    The Arizona Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. The Arizona Plaintiffs also sue Defendants for punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind. The Arizona Plaintiffs also sue Defendants for attorneys' fees and costs and any other just and proper relief available under the Arizona CFA.

## CONNECTICUT

315.    Plaintiffs Chiahan Lee, Michael Medeiros, Camilla Medeiros, Sam Eisner, Andrew Messina, Timothy Giguere, Leo Blais, Bev Lee LLC, Radhy Pena, Howard Weisman, Joseph Cervone, Doren Perruccio, Phillis MacDonald, Scott Ragaglia and Rob Quish (collectively, the "Connecticut Plaintiffs") acquired their Fraudulent Vehicles while in the State of Connecticut. As such, they bring the following causes of action against all defendants.

### CONNECTICUT COUNT 1- FRAUD
### (On behalf of the Connecticut Plaintiffs)

316.    The Connecticut Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

317.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Connecticut Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities

of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

318.    The Audi Gasoline Defendants valued their profits over the trust that the Connecticut Plaintiffs entrusted to them. The Connecticut Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

319.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Connecticut Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

320.    Defendants' false representations and omissions were material to the Connecticut Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Connecticut Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

321.    The Connecticut Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Connecticut Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely

sophisticated technology and could not be discerned by regulators, much less consumers. The Connecticut Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

322.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Connecticut Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Connecticut Plaintiffs.

323.    Defendants had a duty to disclose the Cheat Device to the Connecticut Plaintiffs.

324.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Connecticut Plaintiffs, did not know about (and could not reasonably discover) its scheme.

325.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Connecticut Plaintiffs.

326.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

327.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Connecticut Plaintiffs.

328.    The Connecticut Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

329.    The Connecticut Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Connecticut Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

330.    As a direct and proximate result of Defendants' fraudulent scheme, the Connecticut Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable

emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

331.    Defendants are liable to the Connecticut Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, and the Connecticut Plaintiffs hereby sue for such damages.  Defendants engaged in wanton and malicious misconduct.  Defendants' conduct thus warrants substantial exemplary damages in an amount to be determined at trial, for which the Connecticut Plaintiffs hereby sue.

**CONNECTICUT COUNT 2-**
**VIOLATIONS OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
**(Conn. Gen. Stat. § 42-110A, et seq.)**
**(On behalf of the Connecticut Plaintiffs)**

332.    The Connecticut Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

333.    The Connecticut Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

334.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

335.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

336.    Defendants are in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

337.    Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein.

338.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Connecticut Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

339.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Connecticut UTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

340.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

341.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also

knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

342.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Connecticut Plaintiffs.

343.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

344.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Connecticut UTPA.

345.    Defendants owed the Connecticut Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Connecticut Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Connecticut Plaintiffs that contradicted these representations.

346.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

347.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Connecticut Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

348.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Connecticut Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

349.    The Connecticut Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Connecticut Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Connecticut Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

350.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Connecticut UTPA in the course of their business.

351. Defendants' violations present a continuing risk to the Connecticut Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

352. The Connecticut Plaintiffs are entitled to recover, and hereby sue Defendants for, their actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g. Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

## **FLORIDA**

353. Plaintiffs Walter Alvarado, Cathy Carpenter, Stephen Courson, Pamela Deane, Charles DeSanti, Michael Field, Donna Field, Lenice Graham, Latarsha Mapp, Ana Martinez, Steve Perrigo, Patricia Vega, Timothy White, Zalman Bacheikov, David Silver, John Dahdouh, Sharon McDuffie, Steven Ritz, John Cornell, Judith Cornell, Frederick Wenham, Pam West, Marc Zipper, Jonathan Carroll, Jaime Valencia, Jamie Webster, Ernesto Pozo, Maria Pozo, Patrick Roark, Valerie Zinna, Jill Kantor, David Linginski, Bradley Retherford, Alexander Bahadori, Peter Fanous, Maria Lopez, Stanley Silber, Susan Silber, Allan Sokol, Warren Whittaker, Karen Whittaker, Randy Wolters, Jacqueline Barnett, Tamara Boughter, Lisa Adair, Marc Friedman, Seymour Kantor, Joseph Sloboda, LJ Mahon, Patricia Prodesky, Ben Donnelly, Oliver Jenkins, Timothy Reed, Lorraine Hixson, David Lozier, Edward Rodriguez, John Anderson, Jason Andis, Rodiana Andis, James Burke, Susan Burke, Angelina Fearn, Matthew Jacocks, Thaddeus Shorette, Kimberly Shorette, Patricia Gonzalez, Matthew Wallace, April Sharp, Gregory Otto, and Ronald

Simon (collectively, the "Florida Plaintiffs") acquired their Fraudulent Vehicles while in the State of Florida.   As such, they bring the following causes of action against all defendants.

## FLORIDA COUNT 1- FRAUD
### (On behalf of the Florida Plaintiffs)

354.     The Florida Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

355.     As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Florida Plaintiffs about the true nature of the Fraudulent Vehicles.   Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.   The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

356.     The Audi Gasoline Defendants valued their profits over the trust that the Florida Plaintiffs entrusted to them. The Florida Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

357.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Florida Plaintiffs.   Defendants did so to falsely assure purchasers and lessors of their vehicles,

including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

358.    Defendants' false representations and omissions were material to the Florida Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Florida Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

359.    The Florida Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Florida Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Florida Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

360.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Florida Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Florida Plaintiffs.

361.    Defendants had a duty to disclose the Cheat Device to the Florida Plaintiffs.

362.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Florida Plaintiffs, did not know about (and could not reasonably discover) its scheme.

363.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Florida Plaintiffs.

364.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

365.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Florida Plaintiffs.

366.    The Florida Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

367.    The Florida Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Florida Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

368.    As a direct and proximate result of Defendants' fraudulent scheme, the Florida Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

369.    Defendants are liable to the Florida Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Florida Plaintiffs hereby sue.  Defendants engaged in fraud in conduct with actual malice and deliberate oppression.  Defendants engaged in intentional misconduct, that is, Defendants had actual knowledge of the wrongfulness of the conduct and there was a high probability of injury or damage to the Florida Plaintiffs and, despite that knowledge, Defendants intentionally pursued that course of conduct, resulting in injury or damage.  Defendants also engaged in gross negligence, that is, conduct that was so reckless or wanting in care that it

constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. Defendants engaged in fraud, malice, oppression or such recklessness or negligence as evinces a conscious disregard of the rights of others. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Florida Plaintiffs hereby sue.

**FLORIDA COUNT 2-**
**VIOLATIONS OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, et seq.)**
**(On behalf of the Florida Plaintiffs)**

370. The Florida Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

371. The Florida Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any, including those of the Florida Unfair and Deceptive Trade Practices Act.

372. The Florida Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

373. Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

374. FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

375. In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in

the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Florida Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

376.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Florida FUDTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

377.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

378.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

379.     The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Florida Plaintiffs.

380.     Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

381.     The Audi Gasoline Defendants knew or should have known that their conduct violated the Florida FUDTPA.

382.      Defendants owed the Florida Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.     intentionally concealed the foregoing from the Florida Plaintiffs; and/or

c.     made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Florida Plaintiffs that contradicted these representations.

383.     Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

384.     Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Florida Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

385.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Florida Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

386.    The Florida Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Florida Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Florida Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

387.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Florida FUDTPA in the course of their business.

388.    Defendants' violations present a continuing risk to the Florida Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

389.    The Florida Plaintiffs hereby sue Defendants to recover their actual damages, including economic and non-economic damages (including, without limitation, damages for

embarrassment, humiliation, inconvenience, mental anguish and emotional distress) under Fla. Stat. § 501.211(2) plus attorneys' fees and costs under Fla. Stat. § 501.2105(1) plus any other just and proper relief under FUDTPA.

## IDAHO

390.    Plaintiff Darrel Cherry (the "Idaho Plaintiff") acquired his Fraudulent Vehicle while in the State of Idaho.    As such, he brings the following causes of action against all defendants.

## IDAHO COUNT 1- FRAUD
### (On behalf of the Idaho Plaintiff)

391.    The Idaho Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

392.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Idaho Plaintiff about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

393.    The Audi Gasoline Defendants valued their profits over the trust that the Idaho Plaintiff entrusted to them. The Idaho Plaintiff acquired his car from the Audi Gasoline Defendants

based on their representations regarding compliance with emissions standards, performance, and fuel economy.

394.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Idaho Plaintiff.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

395.     Defendants' false representations and omissions were material to the Idaho Plaintiff, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Idaho Plaintiff highly valued that the vehicle he was acquiring was high performance, fuel efficient, and had low emissions, and he paid a premium accordingly.

396.     The Idaho Plaintiff reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Idaho Plaintiff had no way of discerning that Defendants were, in fact, deceiving him because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Idaho Plaintiff did not, and could not, unravel Defendants' scheme on his own.

397.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Idaho Plaintiff and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further,

it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Idaho Plaintiff.

398.    Defendants had a duty to disclose the Cheat Device to the Idaho Plaintiff.

399.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Idaho Plaintiff, did not know about (and could not reasonably discover) its scheme.

400.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Idaho Plaintiff.

401.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

402.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Idaho Plaintiff.

403.    The Idaho Plaintiff reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring his Fraudulent Vehicle.

404.    The Idaho Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and he would not have acted as he did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Idaho Plaintiff would never have acquired the Fraudulent Vehicle in the first place.

405.    As a direct and proximate result of Defendants' fraudulent scheme, the Idaho Plaintiff sustained damages. He acquired a Fraudulent Vehicle that is non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicle either cannot be repaired to comply with applicable emissions standards, or if it can be made compliant, its performance, fuel efficiency, and longevity will be compromised.

406.    Defendants are liable to the Idaho Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Idaho Plaintiff hereby sues Defendants.  Defendants acted in a manner that was an extreme deviation from reasonable standards of conduct, and the acts were performed with an understanding of or disregard for their likely consequences.  Defendants acted with malice, oppression, fraud, gross negligence, wantonness, willfulness and deliberation.  Defendants'

conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Idaho Plaintiff hereby sues Defendants.

### IDAHO COUNT 2-
### VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Idaho Code § 48-601, et seq.)
### (On behalf of the Idaho Plaintiff)

407.    The Idaho Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

408.    The Idaho Plaintiff has complied with all applicable, pre-suit notice letter provisions, if any.

409.    Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

410.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

411.    Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.  The Idaho CPA prohibits the following: "(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services… (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have… (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another… (9) Advertising goods or services with intent not to sell them as advertised… (17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." Idaho Code § 48-603.  Defendants violated the aforementioned provisions of the Idaho CPA.

412. In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Idaho Plaintiff had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

413. Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Idaho CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

414. The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

415. The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the

law, and that they were manufacturing, selling, and distributing vehicles throughout the United

States that did not comply with EPA regulations, but they concealed this information as well.

416.    The Audi Gasoline Defendants intentionally and knowingly misrepresented

material facts regarding the Fraudulent Vehicles with intent to mislead the Idaho Plaintiff.

417.    Defendants' fraudulent use of the Cheat Device and their concealment of the true

characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions

were material to Plaintiffs.

418.    The Audi Gasoline Defendants knew or should have known that their conduct

violated the Idaho CPA.

419.    Defendants owed the Idaho Plaintiff a duty to disclose truthfully all the facts

concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and
          distributing vehicles throughout the United States that did not comply with EPA
          regulations;

    b.    intentionally concealed the foregoing from the Idaho Plaintiff; and/or

    c.    made incomplete or negligent representations about the environmental cleanliness
          and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device
          in particular, while purposefully withholding material facts from the Idaho Plaintiff
          that contradicted these representations.

420.    Defendants concealed the illegal defeat device and the true emissions, efficiency

and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once

Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted.

In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent

Vehicles are now worth less than they otherwise would be worth.

421.    Defendants' supply and use of the Cheat Device and concealment of the true

characteristics of the engine system were material to the Idaho Plaintiff.  A vehicle made by a

reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

422.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Idaho Plaintiff, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

423.    The Idaho Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Idaho Plaintiff would not have the Fraudulent Vehicle at all and/or—if the Fraudulent Vehicle's true nature had been disclosed and mitigated, and the Fraudulent Vehicle rendered legal to sell—would have paid significantly less for it. The Idaho Plaintiff also suffered diminished value of his vehicle, as well as lost or diminished use.

424.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Idaho CPA in the course of their business.

425.    Defendants' violations present a continuing risk to the Idaho Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

426.    Pursuant to Idaho Code § 48-608, the Idaho Plaintiff sues for actual damages, including economic and non-economic damages (including, without limitation, damages for

embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial and statutory damages in the amount of $1,000 for each Plaintiff.   The Idaho Plaintiff further sues Defendants for attorneys' fees and costs per Idaho Code § 48-608(5) plus any other just and proper relief available under the Idaho CPA.  The Idaho Plaintiff further sues Defendants for punitive damages because Defendants' conduct evidences an extreme deviation from reasonable standards. Defendants flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Fraudulent Vehicles, deceived the Idaho Plaintiff on life-or-death matters, concealed material facts that only they knew, and repeatedly promised the Idaho Plaintiff  all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Fraudulent Vehicles.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages, for which the Idaho Plaintiff hereby sues.

## KANSAS

427.    Plaintiffs Vincent Farha, Cody Campbell, and Adam Emo (collectively, the "Kansas Plaintiffs") acquired their Fraudulent Vehicles while in the State of Kansas.   As such, they bring the following causes of action against all defendants.

### KANSAS COUNT 1- FRAUD
### (On behalf of the Kansas Plaintiffs)

428.    The Kansas Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

429.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Kansas Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by

installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

430.    The Audi Gasoline Defendants valued their profits over the trust that the Kansas Plaintiffs entrusted to them. The Kansas Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

431.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Kansas Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

432.    Defendants' false representations and omissions were material to the Kansas Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Kansas Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

433.    The Kansas Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Kansas Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Kansas Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

434.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Kansas Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Kansas Plaintiffs.

435.    Defendants had a duty to disclose the Cheat Device to the Kansas Plaintiffs.

436.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Kansas Plaintiffs, did not know about (and could not reasonably discover) its scheme.

437.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker,"

vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Kansas Plaintiffs.

438.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

439.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Kansas Plaintiffs.

440.    The Kansas Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

441.    The Kansas Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Kansas Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

442.    As a direct and proximate result of Defendants' fraudulent scheme, the Kansas Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and

severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

443.    Defendants are liable to the Kansas Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, and the Kansas Plaintiffs hereby sue Defendants for such damages. Defendant acted toward the Kansas Plaintiffs with willful conduct, wanton conduct, fraud and malice. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Kansas Plaintiffs hereby sue Defendants.

### KANSAS COUNT 2-
### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
#### (Kan. Stat. Ann. § 50-623, et seq.)
#### (On behalf of the Kansas Plaintiffs)

444.    The Kansas Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

445.    The Kansas Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

446.    Defendants are "suppliers" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

447.    The Kansas Plaintiffs are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Fraudulent Vehicles.

448.    The sale of the Fraudulent Vehicles to the Kansas Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

449.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).  Defendants violated the aforementioned provisions of the Kansas CPA.

450.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Kansas Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

451.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Kansas CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

452.     The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

453.     The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

454.     The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Kansas Plaintiffs.

455.     Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

456.     The Audi Gasoline Defendants knew or should have known that their conduct violated the Kansas CPA.

457.    Defendants owed the Kansas Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Kansas Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Kansas Plaintiffs that contradicted these representations.

458.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

459.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Kansas Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

460.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kansas Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

461.    The Kansas Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Kansas Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Kansas Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

462.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Kansas CPA in the course of their business.

463.    Defendants' violations present a continuing risk to the Kansas Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

464.    Pursuant to Kan. Stat. Ann. § 50-634, the Kansas Plaintiffs sue for monetary relief against Defendants measured as the greater of (a) actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.  The Kansas Plaintiffs further seek punitive damages plus attorneys' fees and costs Kan. Stat. Ann. § 50-634(e) plus any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

## KENTUCKY

465.    Plaintiffs Christopher Smith and Lisa Smith (collectively, the "Kentucky Plaintiffs") acquired their Fraudulent Vehicles while in the State of Kentucky.   As such, they bring the following causes of action against all defendants.

### KENTUCKY COUNT 1- FRAUD
### (On behalf of the Kentucky Plaintiffs)

466.    The Kentucky Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

467.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Kentucky Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

468.    The Audi Gasoline Defendants valued their profits over the trust that the Kentucky Plaintiffs entrusted to them. The Kentucky Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

469. Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Kentucky Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

470. Defendants' false representations and omissions were material to the Kentucky Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Kentucky Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

471. The Kentucky Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Kentucky Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Kentucky Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

472. Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Kentucky Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Kentucky Plaintiffs.

473.    Defendants had a duty to disclose the Cheat Device to the Kentucky Plaintiffs.

474.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Kentucky Plaintiffs, did not know about (and could not reasonably discover) its scheme.

475.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Kentucky Plaintiffs.

476.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

477.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws

governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Kentucky Plaintiffs.

478. The Kentucky Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

479. The Kentucky Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Kentucky Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

480. As a direct and proximate result of Defendants' fraudulent scheme, the Kentucky Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

481. Defendants are liable to the Kentucky Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Kentucky Plaintiffs hereby sue. Defendants acted towards the Kentucky Plaintiffs with fraud, oppression, and malice. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Kentucky Plaintiffs hereby sue.

**KENTUCKY COUNT 2-**
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**(Ky. Rev. Stat. § 367.110, et seq.)**
**(On behalf of the Kentucky Plaintiffs)**

482.    The Kentucky Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

483.    The Kentucky Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

484.    Defendants and the Kentucky Plaintiffs are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

485.    Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. 26 Stat. § 367.110(2).

486.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce ...." Ky. Rev. Stat. § 367.170(1).  Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the engine system, by marketing their vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting themselves as reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

487.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy

test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Kentucky Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

488.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Kentucky CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

489.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

490.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

491.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Kentucky Plaintiffs.

492.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

493.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Kentucky CPA.

494.    Defendants owed the Kentucky Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Kentucky Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Kentucky Plaintiffs that contradicted these representations.

495.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

496.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Kentucky Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

497.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kentucky Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

498.    The Kentucky Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Kentucky Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Kentucky Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

499.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Kentucky CPA in the course of their business.

500.    Defendants' violations present a continuing risk to the Kentucky Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

501.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, the Kentucky Plaintiffs sue Defendants to recover actual damages, including economic and non-economic damages (including, without

limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorneys' fees and costs per Ky. Rev. Stat. Ann. § 367.220(3) plus any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## LOUISIANA

502.    Plaintiffs Michael Kavanaugh, Kyle Wild, Kyle Adams, Karl Wulf, Maritza Wulf and Chris Falk  (collectively, the "Louisiana Plaintiffs") acquired their Fraudulent Vehicles while in the State of Louisiana.   As such, they bring the following causes of action against all defendants.

### LOUISIANA COUNT 1- FRAUD
### (On behalf of the Louisiana Plaintiffs)

503.    The Louisiana Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

504.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Louisiana Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

505.    The Audi Gasoline Defendants valued their profits over the trust that the Louisiana Plaintiffs entrusted to them. The Louisiana Plaintiffs bought their cars from the Audi Gasoline

Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

506.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Louisiana Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

507.    Defendants' false representations and omissions were material to the Louisiana Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Louisiana Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

508.    The Louisiana Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Louisiana Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Louisiana Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

509.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Louisiana Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Louisiana Plaintiffs.

510.    Defendants had a duty to disclose the Cheat Device to the Louisiana Plaintiffs.

511.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Louisiana Plaintiffs, did not know about (and could not reasonably discover) its scheme.

512.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Louisiana Plaintiffs.

513.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

514.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Louisiana Plaintiffs.

515.    The Louisiana Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

516.    The Louisiana Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Louisiana Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

517.    As a direct and proximate result of Defendants' fraudulent scheme, the Louisiana Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

518.    Defendants are liable to the Louisiana Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Louisiana Plaintiffs hereby sue.  Defendants' conduct was wanton and reckless, such conduct threatened the public safety, and the Louisiana Plaintiffs' injuries were caused by such wanton and reckless conduct.  Defendants' conduct thus warrants the award of substantial

punitive damages in an amount to be determined at trial, for which the Louisiana Plaintiffs hereby sue.

## LOUISIANA COUNT 2-
## VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (La. Rev. Stat. § 51:1401, et seq.)
## (On behalf of the Louisiana Plaintiffs)

519.    The Louisiana Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

520.    The Louisiana Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

521.    Defendants and the Louisiana Plaintiffs are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

522.    The Louisiana Plaintiffs are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

523.    Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

524.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

525.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy

test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Louisiana Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

526.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Louisiana CPL by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

527.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

528.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

529.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Louisiana Plaintiffs.

530.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO2$ emissions were material to Plaintiffs.

531.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Louisiana CPL.

532.     Defendants owed the Louisiana Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Louisiana Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Louisiana Plaintiffs that contradicted these representations.

533.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

534.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Louisiana Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

535.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Louisiana Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

536.    The Louisiana Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Louisiana Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Louisiana Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

537.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Louisiana CPL in the course of their business.

538.    Defendants' violations present a continuing risk to the Louisiana Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

539.    Pursuant to La. Rev. Stat. § 51:1409, the Louisiana Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation,

damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial plus treble damages for Defendants' knowing violations of the Louisiana CPL plus attorneys' fees and costs  per La. Rev. Stat. § 51:1409(a) plus any other just and proper relief available under La. Rev. Stat. § 51:1409.

## MINNESOTA

540.    Plaintiffs Jared Grunig and Khosrow Samadani (collectively, the "Minnesota Plaintiffs") acquired their Fraudulent Vehicles while in the State of Minnesota.   As such, they bring the following causes of action against all defendants.

## MINNESOTA COUNT 1- FRAUD
### (On behalf of the Minnesota Plaintiffs)

541.    The Minnesota Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

542.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Minnesota Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

543.     The Audi Gasoline Defendants valued their profits over the trust that the Minnesota Plaintiffs entrusted to them. The Minnesota Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

544.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Minnesota Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

545.     Defendants' false representations and omissions were material to the Minnesota Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Minnesota Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

546.     The Minnesota Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Minnesota Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Minnesota Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

547.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Minnesota Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high

performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Minnesota Plaintiffs.

548.    Defendants had a duty to disclose the Cheat Device to the Minnesota Plaintiffs.

549.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Minnesota Plaintiffs, did not know about (and could not reasonably discover) its scheme.

550.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Minnesota Plaintiffs.

551.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

552.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Minnesota Plaintiffs.

553.    The Minnesota Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

554.    The Minnesota Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Minnesota Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

555.    As a direct and proximate result of Defendants' fraudulent scheme, the Minnesota Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

556.    Defendants are liable to the Minnesota Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Minnesota Plaintiffs hereby sue. Defendants' acted with deliberate disregard

for the rights or safety of others. Defendants knew about facts or intentionally ignored facts that created a high probability of injury to the rights or safety of others, and deliberately acted with conscious or intentional disregard or with indifference to the high probability of injury to the rights or safety of others. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Minnesota Plaintiffs hereby sue.

### MINNESOTA COUNT 2-
### VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, et seq.)
### (On behalf of the Minnesota Plaintiffs)

557.     The Minnesota Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

558.     The Minnesota Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

559.     The Fraudulent Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

560.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1). Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

561.     In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in

the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Minnesota Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

562.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Minnesota CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

563.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

564.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

565.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Minnesota Plaintiffs.

566.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

567.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Minnesota CFA.

568.    Defendants owed the Minnesota Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from the Minnesota Plaintiffs; and/or

    c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Minnesota Plaintiffs that contradicted these representations.

569.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

570.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Minnesota Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

571.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Minnesota Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

572.    The Minnesota Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Minnesota Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Minnesota Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

573.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Minnesota CFA in the course of their business.

574.    Defendants' violations present a continuing risk to the Minnesota Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

575.    Pursuant to Minn. Stat. § 8.31(3a), the Minnesota Plaintiffs seek and hereby sue Defendants for actual damages, including economic and non-economic damages (including,

without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus costs of investigation, attorneys' fees, and court costs per Minn. Stat. § 8.31(3a) plus any other just and proper relief available under the Minnesota CFA. The Minnesota Plaintiffs further seek and hereby sue Defendants for punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## **NEW YORK**

576.    Plaintiffs Deandre Allen, Martin Johnson, Daniel Kaplan, Larthonia Redden, Robert Slochover, Brett Dunne, Alfred Chilampath, Marc Klementowski, LeJuan Moffatt, Helaine Worrell, Armando Desousa, William Hallett, Fahrudin (Frank) Omerovic, Jeffrey Vanefsky, Yvette Hinds, Kenneth Plotkin, Ricardo Santos, Ekaterini Tsirkas, Alex Silverman, Martin Schwartz, Michael Digiuseppi, Jimmy Georgilis, Brad Green, David Elkouby, Gary Dell'Abate, Eriz Yellinek, Sorell Gramada, Robin Meshonek, and David Gleason (collectively, the "New York Plaintiffs") acquired their Fraudulent Vehicles while in the State of New York.   As such, they bring the following causes of action against all defendants.

### **NEW YORK COUNT 1- FRAUD**
### **(On behalf of the New York Plaintiffs)**

577.    The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

578.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the New York Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the

Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

579.    The Audi Gasoline Defendants valued their profits over the trust that the New York Plaintiffs entrusted to them. The New York Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

580.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the New York Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

581.    Defendants' false representations and omissions were material to the New York Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the New York Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

582.    The New York Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The New York Plaintiffs had no way of discerning

111

that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The New York Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

583.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the New York Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the New York Plaintiffs.

584.    Defendants had a duty to disclose the Cheat Device to the New York Plaintiffs.

585.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the New York Plaintiffs, did not know about (and could not reasonably discover) its scheme.

586.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the New York Plaintiffs.

587. Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

588. The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the New York Plaintiffs.

589. The New York Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

590. The New York Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the New York Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

591. As a direct and proximate result of Defendants' fraudulent scheme, the New York Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions

standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

592.     Defendants are liable to the New York Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the New York Plaintiffs sue Defendants. Defendants' conduct was highly morally culpable, gross, wanton, and willful and so reprehensible as to warrant the imposition of punitive damages.   Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the New York Plaintiffs sue Defendants.

### NEW YORK COUNT 2-
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. Gen. Bus. Law § 349)
### (On behalf of the New York Plaintiffs)

593.     The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

594.     The New York Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

595.     The New York Plaintiffs and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

596.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

597.     The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

598.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The New York Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

599.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the New York DAPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

600.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

601.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also

knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

602.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New York Plaintiffs.

603.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

604.    The Audi Gasoline Defendants knew or should have known that their conduct violated the New York DAPA.

605.    Defendants owed the New York Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the New York Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the New York Plaintiffs that contradicted these representations.

606.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

607.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the New York Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

608.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New York Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

609.    The New York Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The New York Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The New York Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

610.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the New York DAPA in the course of their business.

611.    Defendants' violations present a continuing risk to the New York Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

612.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, the New York Plaintiffs have been damaged in an amount to be proven at trial, and hereby sue Defendants for all just and proper remedies, including but not limited to actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages up to $1,000 plus punitive damages plus reasonable attorneys' fees and costs per N.Y. Gen. Bus. Law § 349(h) plus all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT 3-**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**
**(On behalf of the New York Plaintiffs)**

613.    The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

614.    The New York Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

615.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

616.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of …representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to the New York Plaintiffs.

617.    Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Fraudulent Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Fraudulent Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Fraudulent Vehicles in order to intentionally and grossly defraud and mislead the New York Plaintiffs concerning the true emissions produced by the Fraudulent Vehicles.

618.    The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer. Specifically, although Defendants advertised the Fraudulent Vehicles as clean and environmentally-friendly, they in fact used a sophisticated defeat device that was undetectable to the ordinary consumer that made them non-compliant with EPA emission regulations.    Defendants further falsely misrepresented the fuel economy and performance of the Fraudulent Vehicles.

619.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New York Plaintiffs.

620.    Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including the New York Plaintiffs, about the illegality and true characteristics of the Fraudulent Vehicles, the quality of the Defendants' brands and the true value of the Fraudulent Vehicles.

621.    Defendants' violations of the NY FAA present a continuing risk to the New York Plaintiffs and to the general public. Defendants' deceptive acts and practices affect the public interest.

622.    The Fraudulent Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

623.    The New York Plaintiffs who purchased Fraudulent Vehicles either would not have purchased them at all or paid less but for Defendants' false advertising in violation of the NY FAA. The New York Plaintiffs who leased Fraudulent Vehicles either would not have leased them at all, or at a lower rate but for Defendants' false advertising in violation of the NY FAA.

624.    The New York Plaintiffs have suffered injury-in-fact and/or actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) and ascertainable loss as a direct and proximate result of the Defendants' false advertising in violation of the NY FAA, including but not limited to acquiring an illegal vehicle, diminished or complete lost value for the Fraudulent Vehicles they purchased or leased; lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendants' violations of the NY FAA.

625.    The New York Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial.  Because Defendants' conduct was committed willingly and knowingly, the New York Plaintiffs are entitled to recover, and hereby sue Defendants for three time's actual damages.  The

New York Plaintiffs further sue Defendants for attorneys' fees and costs per N.Y. Gen. Bus. Law § 349(h) plus any other just and proper relief under the NY FAA.

### RHODE ISLAND

626.     Plaintiffs Niclas Erhardt, Robert Sheehan, Robert Loiselle, Joseph Del Sesto, and Denis Martin (collectively, the "Rhode Island Plaintiffs") acquired their Fraudulent Vehicles while in the State of Rhode Island.    As such, they bring the following causes of action against all defendants.

### RHODE ISLAND COUNT 1- FRAUD
### (On behalf of the Rhode Island Plaintiffs)

627.     The Rhode Island Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

628.     As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Rhode Island Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

629.     The Audi Gasoline Defendants valued their profits over the trust that the Rhode Island Plaintiffs entrusted to them. The Rhode Island Plaintiffs bought their cars from the Audi

Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

630.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Rhode Island Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

631.     Defendants' false representations and omissions were material to the Rhode Island Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Rhode Island Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

632.     The Rhode Island Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Rhode Island Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Rhode Island Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

633.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Rhode Island Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Rhode Island Plaintiffs.

634.     Defendants had a duty to disclose the Cheat Device to the Rhode Island Plaintiffs.

635.     The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Rhode Island Plaintiffs, did not know about (and could not reasonably discover) its scheme.

636.     The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Rhode Island Plaintiffs.

637.     Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

638.     The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Rhode Island Plaintiffs.

639.    The Rhode Island Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

640.    The Rhode Island Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Rhode Island Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

641.    As a direct and proximate result of Defendants' fraudulent scheme, the Rhode Island Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

642.    The Rhode Island Plaintiffs hereby sue Defendants for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial.  Defendants engaged in willful, wanton and malicious misconduct.  Defendants' conduct thus warrants substantial punitive damages in an amount to be determined at trial, which the Rhode Island Plaintiffs hereby sue for.

## RHODE ISLAND COUNT 2-
## VIOLATIONS OF RHODE ISLAND DECEPTIVE TRADE PRACTICES AND
## CONSUMER PROTECTION LAW
### (R.I. Gen. Laws § 6-13.1 *et seq.*)
### (On behalf of the Rhode Island Plaintiffs)

643.    The Rhode Island Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

644.    Defendants and Plaintiffs are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

645.    Defendants are engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

646.    The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: (v) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) [r]epresenting that goods or services are of a particular standard, quality, or grade …, if they are of another"; (ix) [a]dvertising goods or services with intent not to sell them as advertised"; "(xiii) [u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).  Defendants violated the aforementioned provisions of the Rhode Island DTPA.

647.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result

was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Rhode Island Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

648.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Rhode Island DTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

649.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

650.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

651.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Rhode Island Plaintiffs.

652.     Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

653.     The Audi Gasoline Defendants knew or should have known that their conduct violated the Rhode Island DTPA.

654.      Defendants owed the Rhode Island Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.      intentionally concealed the foregoing from the Rhode Island Plaintiffs; and/or

   c.      made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Rhode Island Plaintiffs that contradicted these representations.

655.     Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

656.     Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Rhode Island Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

657.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Rhode Island Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

658.    The Rhode Island Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Rhode Island Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Rhode Island Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

659.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Rhode Island DTPA in the course of their business.

660.    Defendants' violations present a continuing risk to the Rhode Island Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

661.    Pursuant to R.I. Gen. Laws § 6-13.1-5.2(a), the Rhode Island Plaintiffs hereby sue Defendants to recover their actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus attorneys' fees and costs plus any other just and proper relief

under Rhode Island DTPA. Plaintiffs also sue for punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## TENNESSEE

662.    Plaintiffs Vincent Batson, Melvin Hines, Debra Hines, Dennis Jenkins, Ronald Ward, Iouda Enapay, Michael Rogers, Jim Vaughn, Lance Wilson, Timothy Kuhlman, and Jessica Neal (collectively, the "Tennessee Plaintiffs") acquired their Fraudulent Vehicles while in the State of Tennessee.   As such, they bring the following causes of action against all defendants.

### TENNESSEE COUNT 1- FRAUD
### (On behalf of the Tennessee Plaintiffs)

663.    The Tennessee Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

664.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Tennessee Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

665.    The Audi Gasoline Defendants valued their profits over the trust that the Tennessee Plaintiffs entrusted to them. The Tennessee Plaintiffs bought their cars from the Audi

Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

666.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Tennessee Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

667.     Defendants' false representations and omissions were material to the Tennessee Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Tennessee Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

668.     The Tennessee Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Tennessee Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Tennessee Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

669.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Tennessee Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Tennessee Plaintiffs.

670.    Defendants had a duty to disclose the Cheat Device to the Tennessee Plaintiffs.

671.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Tennessee Plaintiffs, did not know about (and could not reasonably discover) its scheme.

672.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Tennessee Plaintiffs.

673.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

674.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Tennessee Plaintiffs.

675.    The Tennessee Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

676.    The Tennessee Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Tennessee Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

677.    As a direct and proximate result of Defendants' fraudulent scheme, the Tennessee Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

678.    Defendants are liable to the Tennessee Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Tennessee Plaintiffs sue Defendants.   Defendants have acted intentionally, recklessly, maliciously, and fraudulently.   Defendants' conduct thus warrants the award of

substantial punitive damages in an amount to be determined at trial, for which the Tennessee Plaintiffs sue Defendants.

## TENNESSEE COUNT 2-
## VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977
### (Tenn. Code Ann. § 47-18-101, et seq.)
### (On behalf of the Tennessee Plaintiffs)

679.     The Tennessee Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

680.     The Tennessee Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

681.     The Tennessee Plaintiffs are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

682.     Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

683.     The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.  The Tennessee CPA prohibits (1) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods; (2) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (3) representing that goods are of a particular standard, quality or grade if they are of another; (4) advertising goods with intent not to sell them as advertised; (5) engaging in any other act or practice which is deceptive to the consumer or to any other person. Tenn. Code § 47-18-104(b)(2), (5), (7), (9), (27).   Defendants intentionally violated the aforementioned provisions of the Tennessee CPA.

684.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Tennessee Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

685.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Tennessee CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

686.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

687.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also

knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

688.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Tennessee Plaintiffs.

689.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

690.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Tennessee CPA.

691.     Defendants owed the Tennessee Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Tennessee Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Tennessee Plaintiffs that contradicted these representations.

692.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

693.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Tennessee Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

694.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Tennessee Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

695.    The Tennessee Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Tennessee Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Tennessee Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

696.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business.

697.    Defendants' violations present a continuing risk to the Tennessee Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

698.    Pursuant to Tenn. Code § 47-18-109, the Tennessee Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), plus punitive damages plus attorneys' fees and costs per Tenn. Code § 47-18-109(e)(1), plus any other just and proper relief to the extent available under the Tennessee CPA.

## WISCONSIN

699.    Plaintiffs Ken Szafranski, Ronald Nemke and Jacob Moreno (collectively, the "Wisconsin Plaintiffs") acquired their Fraudulent Vehicles while in the State of Wisconsin.   As such, they bring the following causes of action against all defendants.

### WISCONSIN COUNT 1- FRAUD
### (On behalf of the Wisconsin Plaintiffs)

700.    The Wisconsin Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

701.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Wisconsin Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities

of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

702.    The Audi Gasoline Defendants valued their profits over the trust that the Wisconsin Plaintiffs entrusted to them. The Wisconsin Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

703.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Wisconsin Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

704.    Defendants' false representations and omissions were material to the Wisconsin Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Wisconsin Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

705.    The Wisconsin Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Wisconsin Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely

sophisticated technology and could not be discerned by regulators, much less consumers. The Wisconsin Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

706.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Wisconsin Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Wisconsin Plaintiffs.

707.    Defendants had a duty to disclose the Cheat Device to the Wisconsin Plaintiffs.

708.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Wisconsin Plaintiffs, did not know about (and could not reasonably discover) its scheme.

709.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Wisconsin Plaintiffs.

710.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

711.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Wisconsin Plaintiffs.

712.    The Wisconsin Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

713.    The Wisconsin Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Wisconsin Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

714.    As a direct and proximate result of Defendants' fraudulent scheme, the Wisconsin Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions

standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

715.    Defendants are liable to the Wisconsin Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Wisconsin Plaintiffs sue Defendants.  Defendants have engaged in malicious conduct or willful or wanton conduct in reckless disregard of rights or interests.  Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial.

**WISCONSIN COUNT 2-
VIOLATIONS OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT
(Wis. Stat. § 100.18)
(On behalf of the Wisconsin Plaintiffs)**

716.    The Wisconsin Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

717.    The Wisconsin Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

718.    The Wisconsin Plaintiffs are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

719.    The Wisconsin Plaintiffs purchased or leased one or more Fraudulent Vehicles.

720.    The Wisconsin Plaintiffs are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

721.    Defendants are a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

722.     The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

723.     In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Wisconsin Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

724.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Wisconsin DTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

725.     The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

726.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

727.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Wisconsin Plaintiffs.

728.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

729.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

730.    Defendants owed the Wisconsin Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Wisconsin Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Wisconsin Plaintiffs that contradicted these representations.

731.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted.

In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

732.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Wisconsin Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

733.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Wisconsin Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

734.    The Wisconsin Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Wisconsin Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Wisconsin Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

735.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of their business.

736.    Defendants' violations present a continuing risk to the Wisconsin Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

737.    The Wisconsin Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2) plus any other just and proper relief available under the Wisconsin DTPA.

WHEREFORE, Plaintiff, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants, as follows:

A.    Actual damages;

B.    Treble damages;

C.    Punitive and exemplary damages;

D.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of litigation expenses, costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

DATED:  December 21, 2017

Respectfully submitted,


/s/ Charles Wade Miller
Charles Wade Miller
VSB No. 92647
Attorney for Plaintiffs
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Tel: (214) 237-9001
Fax: (214) 237-9002
charles@hop-law.com


**Attorney for Plaintiffs**


*Pro Hac Vice Admission to be sought for*

Michael E. Heygood
michael@hop-law.com
Eric D. Pearson
eric@hop-law.com
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Tel: (214) 237-9001
Fax: (214) 237-9002


**Attorneys for Plaintiffs**